O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| LORI LYNN DE LA O, | ) | Case No. CV 11-2399 JPR |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OPINION AND ORDER |
| | ) | AFFIRMING THE COMMISSIONER |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security Disability Insurance Benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed March 19, 2012.  The Court has taken the Joint Stipulation under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on August 8, 1966.  (Administrative Record ("AR") 33.)  She has a high-school education and previously worked as a front-office receptionist, secretary, and dental-claims associate.  (AR 122, 187.)  Plaintiff claims to have been disabled since March 30, 2006.  (AR 95.)

On January 22, 2008, Plaintiff filed an application for DIB.  (AR 95-101.)  After her application was denied, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 20, 2009.  (AR 49-54.)  Plaintiff appeared with counsel and testified on her own behalf.  (Id.)  Plaintiff's family members and friend submitted statements regarding Plaintiff's limitations.  (AR 148-55, 211-18.)  On August 17, 2009, the ALJ denied Plaintiff's claim, determining that she had the severe impairment of fibromyalgia (AR 29-30) but was not disabled because she retained the residual functional capacity ("RFC")[1] to perform "medium work" with "mild to moderate limitation in responding appropriately to coworkers, supervisors, or the public."  (AR 32.)  Plaintiff requested review of the ALJ's decision and submitted additional evidence to the Appeals Council.  (AR 4, 20.)  On January 21, 2011, after considering the new evidence, the Appeals Council denied Plaintiff's request for review.  (AR 1-3.)  This action followed.

---

[1]  RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545(a); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

### III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The Commissioner's or ALJ's findings and decision should be upheld if they are free of legal error and are supported by substantial evidence based on the record as a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

### IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a severe physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42

1  U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

2  (9th Cir. 1992).

3       **A.   The Five-Step Evaluation Process**

4       The ALJ follows a five-step sequential evaluation process to

5  assess if a claimant is disabled.   20 C.F.R. § 404.1520(a)(4);

6  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

7  amended Apr. 9, 1996).   In the first step, the ALJ must determine

8  whether the claimant is currently engaged in substantial gainful

9  activity; if so, the claimant is not disabled and the claim is

10  denied.   § 404.1520(a)(4)(i).   If the claimant is not engaged in

11  substantial gainful activity, the second step requires the ALJ to

12  determine whether the claimant has a "severe" impairment or

13  combination of impairments significantly limiting her ability to

14  do basic work activities; if not, a finding of nondisability is

15  made and the claim is denied.   § 404.1520(a)(4)(ii).   If the

16  claimant has a "severe" impairment or combination of impairments,

17  the third step requires the ALJ to determine if the impairment or

18  combination of impairments meets or equals an impairment in the

19  Listing of Impairments ("Listing") set forth at 20 C.F.R., Part

20  404, Subpart P, Appendix 1; if so, disability is conclusively

21  presumed and benefits are awarded.   § 404.1520(a)(4)(iii).   If

22  the claimant's impairment or combination of impairments does not

23  meet or equal an impairment in the Listing, the fourth step

24  requires the ALJ to determine whether the claimant has sufficient

25  RFC to perform her past work; if so, the claimant is not disabled

26  and the claim is denied.   § 404.1520(a)(4)(iv).   The claimant has

27  the burden of proving she is unable to perform past relevant

28  work.   Drouin, 966 F.2d at 1257.   If the claimant meets that

4

burden, a prima facie case of disability is established.   <u>Id.</u>   If that happens or if the claimant has no past relevant work, the ALJ then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.   § 404.1520(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis.   § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

### B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since March 30, 2006.   (AR 29.) At step two, the ALJ concluded that Plaintiff's fibromyalgia was a "severe impairment" but her mental impairments were "nonsevere."   (AR 29-31.)   At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled any of the impairments in the Listing.   (AR 32.)   At step four, the ALJ found that Plaintiff had the RFC to perform "medium work as defined in 20 C.F.R. 404.1567(c), with mild to moderate limitation in responding appropriately to coworkers, supervisors, or the public."   (AR 32-33.)   At step five, the ALJ found that Plaintiff was able to perform past relevant work as a front-office receptionist, secretary, or dental-claims associate.   (AR 33-34.)   The ALJ further found that Plaintiff could perform other jobs that existed in significant numbers in the national economy.   (AR 33-34.)   The ALJ therefore concluded that Plaintiff was not under a disability from the alleged onset date, March 30, 2006, through the date of decision, August 17, 2009.   (AR 34.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ (1) improperly rejected the opinion of Dr. Geoffrey L. Loman, her treating physician (J. Stip. 3-10); (2) failed to address third-party statements from Plaintiff's mother, father, friend, then-spouse, employer, and therapist (J. Stip. 15-19); (3) improperly evaluated Plaintiff's mental impairments (J. Stip. 24-26); and (4) improperly determined that Plaintiff was able to perform her past work (J. Stip. 29-33).

**A.   Rejection of Treating Physician's Opinion**

**1.   The governing law**

A treating physician's opinion is entitled to special weight because she is employed to cure and had the opportunity to know and observe the patient as an individual.  See McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  See 20 C.F.R. § 404.1527(d)(2). If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.  See Lester, 81 F.3d at 830; Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).  When the treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record.  See, e.g., Reddick,

6

157 F.3d at 725.

## 2. Relevant facts

Dr. Loman had regularly treated Plaintiff at the Brent Street Family Practice since at least January 2000. (AR 240-337, 393-405, 474-494, 512-555, 585-87.) Before May 2006, when, Plaintiff alleges, her disability began, Dr. Loman, a general practitioner, treated Plaintiff for a variety of issues, including back and neck pain from two motor-vehicle accidents, back strain and spasm, gynecological issues, reactive airway disease, bronchitis, allergies, depression, anxiety, and panic attacks. (AR 260-309.)

In May 2006, Dr. Loman noted that Plaintiff was "continuing to be quite anxious, associated with fatigue, difficulty concentrating"; was having trouble sleeping; and had "diffuse body aches." (AR 258.) She appeared depressed but had normal speech, language, and cognition. (Id.) He diagnosed "[g]eneralized anxiety disorder despite multiple medications" and "[f]ibromyalgia-like picture with fatigue, aches, sleep disorder, and multiple trigger points."[2] (Id.) Dr. Loman increased Plaintiff's trazodone, noted that she "may be a candidate for

---

[2]   Fibromyalgia is a "rheumatic disease that causes inflamation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004) (citations omitted). Common symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Id. at 590 (citations omitted). Fibromyalgia's cause is unknown, and it is "diagnosed entirely on the basis of patients' reports of pain and other symptoms." Id.

7

Topamax or some other type of medication to target fibromyalgia," and recommended she join Weight Watchers, lose weight, and start water exercise.  (Id.)

In July 2006, Dr. Loman reported that Plaintiff "is sleeping better and is feeling less anxious" but "continues to wake up quite fatigued and continues to complain of shooting pains and aches throughout her body." (AR 257.) Dr. Loman noted that Plaintiff has "trigger points all over." (Id.) His diagnosis was anxiety and depression, which had improved on a regimen of Wellbutrin, Paxil, and trazadone, and fibromyalgia, which "seems to be what is troubling her the most at this time and is limiting her activities." (Id.) Dr. Loman prescribed Neurontin and recommended she continue water therapy and massage, rest more, and improve her nutrition.  (Id.)

In August 2006, Dr. Loman noted that Plaintiff "continues to have body aches that have been essentially unchanged" and was often "disabled" from them. (AR 256.) He found that Plaintiff was "better in terms of her fatigue," and she was sleeping better and was less anxious. (Id.) Dr. Loman's diagnosis was "[f]ibromyalgia with body aches"; he prescribed Lyrica because Plaintiff was unable to tolerate Neurontin. (Id.)

In November 2006, Dr. Loman noted that Plaintiff suffered from anxiety, depression, fibromyalgia with chronic pain, and weight gain.  (AR 254.) He found Plaintiff "quite anxious and depressed" and "not exercising much secondary to the fibro." (Id.) Dr. Loman increased Plaintiff's Lyrica and encouraged her to get counseling, improve her diet, and exercise. (Id.) Later that month, Dr. Loman noted that Plaintiff "is feeling better

with her fibromyalgia after the Lyrica has been increased." (AR 252.)  In December, Dr. Loman noted that Plaintiff had "marked pain" when she discontinued Lyrica due to a pharmacy mix-up but was much better once she was back on her medication. (AR 251.) She was "getting more strength and has begun a regular exercise program although she is only able to exercise for short periods of time." (Id.)  He concluded that her fibromyalgia and anxiety were "overall improving" but she was still "unable to work for any period of time." (Id.)

In January 2007, Dr. Loman noted that Plaintiff's anxiety "seems to be a bit better," but her "fibromyalgia and chronic pain seems [sic] to be a bit worse," which Plaintiff attributed to the cold weather. (AR 250.) Dr. Loman noted that "[o]n exam there are multiple trigger points that are tender to touch" but no joint symptoms. (Id.)  He increased her Lyrica and found she was "clearly unable to go back to work" at that time. (Id.)

In April 2007, Dr. Loman noted that Plaintiff was "feeling pretty lousy" and had stopped her exercise program after a death in the family. (AR 247.) His assessment was fibromyalgia with chronic fatigue and anxiety; he recommended she continue her current medications and exercise regimen and gave her "disability" for six more months. (Id.)

In June 2007, Dr. Loman noted that Plaintiff was "doing better with regard to her anxiety" and "[h]as been getting out more." (AR 246.)  She was "still having problems with chronic pain and fatigue" and "still feels she would be unable to hold down any kind of employment at this time as when she spends a day doing activities she sleeps for 2-3 days following." (Id.)  His

9

assessment was "[f]ibromyalgia with chronic fatigue and pain" and "chronic anxiety, improved." (<u>Id.</u>) He recommended that she continue her current regimen and continue exercising. (<u>Id.</u>)

In July 2007, Dr. Loman noted that Plaintiff "is overall doing better from the standpoint of her fibromyalgia but possibly worse from her [sic] standpoint of her anxiety." (AR 245.) His assessment was "[a]nxiety with recent exacerbation" and "fibromyalgia, overall improved with chronic fatigue aspects." (<u>Id.</u>) Dr. Loman noted that they "talked about possibly getting involved in some counseling" and that "[s]he is to continue to be on disability." (<u>Id.</u>)

In August 2007, Dr. Loman noted that Plaintiff had lost eight pounds and was exercising, and she was able to cut back on her Xanax and Vicodin. (AR 244.) He found she was less depressed and did not appear anxious, and she had normal speech, language, and cognition. (<u>Id.</u>) His assessment was "[a]nxiety and depression, clinically improved" and "[f]ibromyalgia, also appears to be improved." (<u>Id.</u>)

In November 2007, Dr. Loman noted that Plaintiff's anxiety and fibromyalgia both seemed to be improving. (AR 243.) He and the Plaintiff talked about cutting back her medication and "getting her back into a job on a part time basis." (<u>Id.</u>) His assessment included "[c]hronic anxiety and depression, overall improved," "[f]ibromyalgia with diffuse body pains," and osteoarthritis. (AR 242.) In December, he noted that Plaintiff was feeling better until a cold "set her back." (AR 242.) In January 2008, Dr. Loman noted that Plaintiff had an upper respiratory infection and a "flare of her fibromyalgia," which

1  was possibly associated with her respiratory symptoms.  (AR 241.)
2  In April 2008, Dr. Loman noted that Plaintiff's fibromyalgia was
3  improving.  (AR 399.)

4      On May 4, 2008, Dr. Dean Chiang, who was board-certified in
5  internal medicine, examined Plaintiff at the request of the
6  Social Security Administration.  (AR 338-41.)  Dr. Chiang did not
7  review any medical records, but upon examination he found that
8  Plaintiff was an "obese individual" who was "fully ambulatory and
9  fully weightbearing" and had "full manual dexterity."  (AR 338-
10  39.)  She was able to "sit comfortably during the examination,"
11  "get on and off the examination table without distress," converse
12  normally, and follow all commands.  (AR 339.)  Plaintiff
13  displayed "multiple tender points, including all along the
14  paraspinal muscles in the trapezius region, deltoids, medial
15  aspects of the knees, and anterior thighs."  (AR 340.)  He found
16  Plaintiff had "normal muscle bulk and tone," with motor strength
17  a "5/5 throughout."  (Id.)  Dr. Chiang diagnosed "[f]ibromyalgia,
18  with an unremarkable physical exam" and rendered the following
19  functional assessment:

20      The  [Plaintiff]  does  not  appear  to  have  any
21      musculoskeletal or neurological limitations that would
22      inhibit her standing, walking or sitting.  She does not
23      need any assistive device.  There are no weight lifting
24      or carrying restrictions.  There are no postural or
25      manipulative limitations and no visual, environmental or
26      communicative limitations.

27  (AR 341.)

28      On May 28, 2008, Lance A. Portnoff, Ph.D., a

neuropsychologist, examined Plaintiff at the request of the Social Security Administration.  (AR 361-66.)  Dr. Portnoff reviewed Plaintiff's background information and administered several tests, including the Wechsler Adult Intelligence Scale-III, Wechsler Memory Scale-Revised, Trails A/Trails B, and Bender-Gestalt-II.  (AR 361.)  Based on the results of those tests, Dr. Portnoff concluded that Plaintiff had average intelligence, with generally intact memory function and attention.  (AR 362-64.)  He found that she had "mildly rambling thinking and moderate anxiety and depression," but that her psychological testing was unremarkable compared with the average individual in her age range.  (AR 364.)  Although Dr. Portnoff found "mild problems" with her fund of knowledge, visual attention to detail, reversed digit-span, and visual span, he concluded that they were "too mild to warrant a diagnosis." (Id.)  He diagnosed depressive disorder not otherwise specified with anxious features and panic disorder with agoraphobia, and he assigned a global-assessment-of-functioning score of 60.  (AR 365.)

Dr. Portnoff concluded that Plaintiff's psychological issues resulted in no restrictions in daily activities and no difficulties with concentration, persistence, or pace.  (Id.)  He found that Plaintiff was able to carry out and remember simple instructions and had no limitations in her ability to respond appropriately to a routine work setting.  (Id.)  Dr. Portnoff did find, however, that Plaintiff had mild limitations in maintaining social functioning because of panic attacks, agoraphobia, and anxious depression; mild-to-moderate limitations in her ability

12

to respond appropriately to coworkers, supervisors, and the public because of anxious depression; and mild limitations in her ability to deal with unexpected changes in a work setting because of anxious depression.  (Id.)

From May to October 2008, Dr. Loman saw Plaintiff for anxiety-related complaints, a rash, low back strain, and lab work.  (AR 393-98, 403.)  In December 2008, Dr. Loman noted that Plaintiff was "having a flare in her fibromyalgia" and suffered from reactive airway disease and fatty liver changes.  (AR 487.) In January 2009, Dr. Loman treated Plaintiff for mild concussion syndrome that resulted "when she was hit in the head by her husband as he rolled over in bed," and in April he treated her for bronchitis and reactive airway disease.  (AR 483-86.)

In April 2009, Dr. Loman noted that Plaintiff "has a lot of questions about disability" and "is trying to get some type of disability ruling and is working with a lawyer for this."  (AR 482.)  He opined that Plaintiff "is unable to do much in the way of prolonged sitting, prolonged standing, or any activities for meaningful work," and that her limitations "are based on both her pain from her fibromyalgia, as well as her anxiety an [sic] depression."  (Id.)

In a medical source statement dated April 20, 2009, Dr. Loman listed Plaintiff's diagnoses as "fibromyalgia, depression, GAD [generalized anxiety disorder], RAD [reactive airway disease], migraine HA's, cervical [and] lumbar disc disease, s/p ulcerative colitis, s/p bowel resection [with] ostomy."  (AR 481.)  Dr. Loman opined that Plaintiff could occasionally lift and carry a maximum of 10 pounds, frequently lift and carry less

than 10 pounds, stand and walk for less than two hours total in an eight-hour day, and sit continuously for about six hours in an eight-hour day.  (Id.)  Dr. Loman also stated that Plaintiff was moderately limited in her ability to push and pull, limited in her ability to operate controls due to muscle spasm and other symptoms, unable to sit continuously, and unable to drive due to pain medication.  (Id.)  Dr. Loman stated that Plaintiff's limitations had existed for "years [with] gradual worsening [with] significant worsening in 2006."  (Id.)

In a report dated May 9, 2009, Dr. Loman opined that Plaintiff could lift and carry less than 10 pounds, stand or walk for less than two hours in an eight-hour day, and sit continuously for less than one hour.  (AR 479.)  These findings were substantially more restrictive than the ones he had made just three weeks earlier, on April 20.  (AR 481.)  Dr. Loman found Plaintiff's ability to push and pull with her upper and lower extremities moderately limited.  (AR 480.)  He also noted that Plaintiff has "underlying anxiety [and] depression but is getting medical [and] psych treatment."  (AR 480.)  On May 1, 2009, about two months before the ALJ hearing, Plaintiff started seeing a licensed marriage and family therapist, Patricia Wuebel. (AR 496-97.)  This was apparently the first counseling she had pursued after being advised by Dr. Loman in 2006 and 2007 that she needed it.  (AR 245, 254.)

On August 17, 2009, the ALJ denied Plaintiff's claim.  (AR 27-34.)  The ALJ found that Dr. Loman's RFC assessment was "not generally credible" because of "internal inconsistency with his progress notes of overall, general improvement when the claimant

14

was compliant with medical treatment including prescribed medication." (AR 32.) The ALJ found the reports of consultative examiners Drs. Chiang and Portnoff, on the other hand, to be "fully credible, based on supportability with medical signs and laboratory findings; consistency with the record; and areas of specialization"; the ALJ therefore accorded them "significant weight." (Id.) The ALJ then concluded that Plaintiff had the RFC to perform "medium work," which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" (20 C.F.R. § 404.1567(c)), with mild to moderate limitation in responding appropriately to coworkers, supervisors, and the public. (AR 32.)

After the ALJ issued his decision, Plaintiff submitted to the Appeals Council Dr. Loman's treatment notes postdating the ALJ's decision (AR 518-21) and a July 2010 fibromyalgia RFC assessment that described Plaintiff's symptoms since the "earliest" applicable date of June 1, 2010 (AR 585-87). Because that information related to a period after the ALJ's decision, it is not relevant to this Court's ruling. See § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."); cf. Taylor v. Comm'r, Soc. Sec. Admin., 659 F.3d 1228, 1233 (9th Cir. 2011) (Appeals Council should have considered doctor's later opinion of disability because it related to period before disability insurance expired and before ALJ issued decision).

### 3.   Analysis

Reversal is not warranted based on the ALJ's alleged failure to properly evaluate Dr. Loman's opinion.

The ALJ's finding that Dr. Loman's opinion that Plaintiff's condition had steadily worsened through the years was inconsistent with his progress notes of "overall, general improvement when [Plaintiff] was compliant with medical treatment" was supported by substantial evidence.  The ALJ was therefore entitled to discount Dr. Loman's opinion on that basis. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with the treatment reports).

Although Dr. Loman sometimes noted "flares" of fibromyalgia and worsening psychological symptoms, for the most part, his notes reflected overall improvement in Plaintiff's symptoms as time went on and she received treatment.  (See, e.g., AR 244 (anxiety, depression, fibromyalgia improved), 245 (fibromyalgia better, anxiety possibly worse), 250 (anxiety better, fibromyalgia worse), 252 (fibromyalgia and anxiety overall improving), 256 (sleeping better and less anxious), 257 (anxiety

16

1   and depression improved), 399 (fibromyalgia improving), 243

2   (anxiety and fibromyalgia improving)).  Plaintiff often failed to

3   follow Dr. Loman's recommendations that she lose weight and

4   exercise (AR 254, 257-58), but when she did, Dr. Loman noted

5   improved symptoms (see, e.g., AR 251 (Plaintiff gaining strength

6   and regularly exercising, fibromyalgia and anxiety "overall

7   improving"), 247 (Plaintiff was "feeling pretty lousy" and had

8   stopped her exercise program), 244 (Plaintiff lost eight pounds

9   and was exercising; anxiety and depression improved)).  Indeed,

10  by November 2007, Dr. Loman was encouraging Plaintiff to find

11  part-time work.  (AR 243.)  From May 2008 to early April 2009,

12  Plaintiff saw Dr. Loman several times (AR 393-99, 403, 483-87)

13  for other reasons but only once complained of anxiety (AR 398)

14  and reported only a single flare of fibromyalgia (AR 487).

15      Moreover, the ALJ was entitled to credit the opinions of

16  Drs. Chiang and Portnoff instead of Dr. Loman because those

17  opinions were supported by independent clinical findings and thus

18  constituted substantial evidence upon which the ALJ could

19  properly rely.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149

20  (9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir.

21  1995).  Dr. Chiang performed a physical exam of Plaintiff,

22  noting, among other things, her gait, ranges of motion, tender

23  points, and motor strength, and then concluded that she had no

24  limitations as a result of her fibromyalgia.  (AR 338-41.)  Dr.

25  Portnoff, meanwhile, reviewed Plaintiff's background information,

26  performed a mental status exam, and administered four different

27  psychological tests before finding she was largely unlimited by

28  her mental impairments.  (AR 361-66.)  Indeed, Drs. Chiang's and

17

Portnoff's conclusions were generally consistent with Dr. Loman's, who around the same time as their examinations had noted Plaintiff's overall improvement to the point that she was again looking for work. (AR 243.) In any event, any conflict in the properly supported medical-opinion evidence was the sole province of the ALJ to resolve. See Andrews, 53 F.3d at 1041.

Moreover, Dr. Loman was a family doctor, whereas Dr. Chiang specialized in internal medicine (AR 341) and Dr. Portnoff in neuropsychology (AR 361). Thus, as the ALJ found (AR 32), the opinions of Drs. Chiang and Portnoff were entitled to greater weight that Dr. Loman's based on their areas of specialization. See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) (same).

Accordingly, the ALJ provided specific, legitimate reasons for rejecting Dr. Loman's opinion. Plaintiff is not entitled to remand on this ground.

## B. Rejection of Third-Party Statements

### 1. The governing law

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks omitted)); see also 20 C.F.R. § 404.1513(d) (statements from therapists, family, and friends can be used to show severity of impairment(s) and effect

on ability to work).  Such testimony is competent evidence and "cannot be disregarded without comment." <u>Bruce</u>, 557 F.3d at 1115 (quoting <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996) (internal quotation marks omitted)); <u>Robbins</u>, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings.").  When rejecting the testimony of a lay witness, an ALJ must give specific reasons that are germane to that witness.  <u>Bruce</u>, 557 F.3d at 1115; <u>see also Stout</u>, 454 F.3d at 1054; <u>Nguyen</u>, 100 F.3d at 1467.

If an ALJ fails to discuss competent lay testimony favorable to the claimant, "a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." <u>Stout</u>, 454 F.3d at 1056; <u>see also Robbins</u>, 466 F.3d at 885.  But "an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims." <u>Molina v. Astrue</u>, 674 F.3d 1104, 1122 (9th Cir. 2012) (quoting <u>Buckner v. Astrue</u>, 646 F.3d 549, 560 (8th Cir. 2011)).

### 2.   Relevant facts

In a statement dated February 13, 2008, Theresa Martinez,[3] Plaintiff's mother, wrote that pain and fatigue affected Plaintiff's ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, concentrate, remember, and use her

---

[3]   The Court refers to Plaintiff's parents by first name because they have the same last name.

hands.  (AR 153.)  Theresa wrote that Plaintiff could walk only a half block before needing to rest for five minutes, and she could pay attention for about an hour.  (Id.)  In a statement dated June 21, 2009, Theresa wrote that in late 2005, she started noticing that Plaintiff would become more tired when she tried swimming, and in March 2006 Plaintiff was no longer able to work due to pain and fatigue.  (AR 211.)  Theresa said that housekeeping, grocery shopping, and everyday routine would quickly wear Plaintiff out, and so she assisted Plaintiff with many of those tasks.  (Id.)

In a statement dated June 22, 2009, Richard Martinez, Plaintiff's father, described Plaintiff's medical history and stated that after a car accident in 1999, Plaintiff returned to work but "steadily became worse and missed many days of work as well as having to leave early, and often due to great pain and terrible headaches."  (AR 213.)  Richard stated that Plaintiff became disabled in March 2006, and he had "been witness to her continual decline" as she suffered from "short and long term memory loss, pain, and more pain throughout her body, unable to do housework, balance her check book and suffers from complete colon incontinence[4] and limited functions with worsening depression."  (Id.)

In a statement dated June 21, 2009, Renee S. Goldade, Plaintiff's friend, wrote that Plaintiff "has a lot of difficulty with most of the simple tasks in her everyday life" and has to

_____

[4]  Plaintiff had a history of ulcerative colitis and her colon was removed in 1990, leaving her with an ileostomy.  (AR 195, 213, 340, 357, 362, 416, 422.)

20

"cancel plans often because of sleeplessness, muscle pain, swelling in joints, [and] fatigue." (AR 215.)  Goldade said that if they go somewhere, she has to drive because of Plaintiff's medications, and Plaintiff "tends to mix her words or forgets what she is saying" and leaves things at Goldade's house "all the time." (Id.)  Goldade said that sometimes Plaintiff's pain is so bad that she can't talk on the phone or get out of bed, and she "needs help with the simplest of things." (Id.)

In a statement dated July 15, 2009, Robert Patrick Knollmiller, Plaintiff's then-spouse, wrote that Plaintiff "goes through terrible pains with her fibromyalgia" and couldn't work due to her "joints and muscles hurting." (AR 217.)  Knollmiller said, "Before I go to work I get her out of bed, and I help her to the restroom so she doesn't fall." (Id.)  Plaintiff "has a lot of trouble sleeping" and is so depressed that "she has told me many times that she wishes she would die in her sleep." (Id.)  He wrote that Plaintiff "continues to have severe panic attacks, and is irritable, and has had to stop doing things that she used to enjoy." (Id.)  Knollmiller said he "had to completely take over our finances due to her memory[] and concentration problems," and he "even ha[s] to remind her to take her medications." (Id.)

Plaintiff also submitted a March 30, 2006 termination letter from Linda Woodams, the office manager at Plaintiff's previous employer. (AR 189-90.)  Woodams wrote that in the 20 months Plaintiff was employed, she worked only 74.17% of the scheduled time. (AR 189.)  Woodams noted that "a number of personal and family issues" contributed to her excessive absenteeism. (AR

21

189.)

In a statement dated July 11, 2009, Patricia Wuebel, Plaintiff's therapist[5] since May 2009, wrote that Plaintiff met the criteria for major depression, including daily depressed mood, diminished interest and pleasure, significant weight gain, insomnia, psychomotor retardation, fatigue, excessive guilt, diminished ability to concentrate, and indecisiveness.  (AR 496.) Wuebel stated that Plaintiff was unable to work, her energy was limited, and her pain increased with activity.  (AR 496-97.) Wuebel stated that Plaintiff was "psychologically compromised" in spite of her psychiatric medications, suffered from panic attacks, and had "lost all tolerance for highly emotional situations."  (Id.)

In a treatment summary dated July 21, 2010, almost a year after the ALJ issued his decision, Wuebel again described Plaintiff's psychological symptoms and also stated that Plaintiff's fibromyalgia symptoms were severe and limited her daily activities.  (AR 594.)  She attached a mental impairment questionnaire that stated that Plaintiff had severe major depression with symptoms including, among other things, poor memory, weight change, mood and sleep disturbances, recurrent

---

[5]   Wuebel, as a therapist rather than a doctor, is not an "acceptable medical source" who can establish an impairment or give a medical opinion.  See 20 C.F.R. § 404.1513(a).  But therapists, like a claimant's family and friends, can serve as "other sources" for information showing the severity of a claimant's impairment and how it affects her ability to work. Id. § 404.1513(d); SSR 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006) (clarifying how Social Security Administration considers opinions from sources who are not "acceptable medical sources").

panic attacks, perceptual disturbances, social withdrawal or isolation, decreased energy, and suicidal ideation.  (AR 596.) Wuebel concluded that Plaintiff had a marked restriction of activities of daily living; moderate difficulties in maintaining social functioning; frequent difficulties with concentration, persistence, and pace; and continual episodes of deterioration or decompensation in work or work-like settings.  (AR 599.)

### 3.   Analysis

The ALJ did not address the lay-witness statements from Plaintiff's mother, father, friend, and then-spouse.  Although the ALJ erred in failing to give germane reasons for rejecting this testimony, the error was harmless because the testimony described the same limitations as Plaintiff's own testimony, and the ALJ's reasons for rejecting Plaintiff's testimony "apply with equal force to the lay testimony."  Molina, 674 F.3d at 1122.

Plaintiff testified at the hearing that her ability to work was limited because of "extreme body pain," "frozen" hands, "numb" feet, muscle cramping in arms and legs, headaches that affected her vision, and extreme fatigue.  (AR 114.)  In a function report, Plaintiff stated that her conditions also resulted in "declining memory and poor concentration."  (AR 144.) But the ALJ found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of [her] symptoms" were not credible to the extent they were inconsistent with the RFC determination.  (AR 32.)  The ALJ noted that Plaintiff's credibility was diminished because she did not follow up on Dr. Loman's advice to maintain an appropriate diet and exercise, nor did she did consult with an appropriate specialist such as a

rheumatologist or neurologist.[6]  (AR 32-33.)  The ALJ also found,
among other things, that there was no credible report from a
treating doctor that supported her subjective complaints, and
with regard to her mental impairments, there were no diagnostic
examinations or objective signs and symptoms observed.  (AR 32-
33.)  The ALJ specifically noted that Plaintiff's "cognitive
deficits were too mild to warrant a diagnosis, based on clinical
psychological testing."  (AR 31.)  The ALJ's reasons constituted
appropriate bases for discounting Plaintiff's subjective symptom
testimony.  See, e.g., Coleman v. Astrue, 423 F. App'x 754, 756
(9th Cir. 2011) (when evaluating credibility, ALJ may consider
claimant's failure to follow repeated medical recommendations
that she treat fibromyalgia pain with exercise and increased
activity levels); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir.
2005) ("Although lack of medical evidence cannot form the sole
basis for discounting pain testimony, it is a factor that the ALJ
can consider in his credibility analysis."); Meanel v. Apfel, 172
F.3d 1111, 1114 (9th Cir. 1999) (ALJ may consider failure to seek
treatment); Morgan v. Comm'r, Soc. Sec. Admin., 169 F.3d 595, 600
(9th Cir. 1999) (ALJ may properly consider conflict between
claimant's testimony of subjective complaints and objective

---

      [6] Despite Dr. Loman's recommendations to seek counseling
(AR 245, 254), Plaintiff failed to meet with a therapist until
years later, on May 1, 2009 (AR 496-97), approximately two months
before the ALJ hearing.  And Plaintiff did not see a psychiatrist
until June 19, 2009, just one month before the hearing.  (AR 496,
565-66.)  The Court, however, does not rely on these facts in
affirming the ALJ's decision.  See Regennitter v. Comm'r, Soc.
Sec. Admin., 166 F.3d 1294, 1299-1300 (9th Cir. 1999)
(criticizing reliance on failure to seek treatment to reject
mental-health complaints); Nguyen, 100 F.3d at 1465 (same).

medical evidence in the record); Bunnell, 947 F.2d at 346 (ALJ may consider "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment").[7] Indeed, with a disease such as fibromyalgia, for which there are few if any objectively discernable symptoms, a claimant's failure to follow up with recommended treatment is all the more critical in evaluating whether she is truly disabled.  See generally Benecke, 379 F.3d at 590 (fibromyalgia diagnosed solely on basis of patient's reports of pain and other symptoms).

The statements of Plaintiff's family and friend also described limitations from fatigue, pain, and cognitive issues. Thus, because the ALJ provided "well-supported grounds for rejecting testimony regarding specified limitations," the Court "cannot ignore the ALJ's reasoning and reverse the agency merely because the ALJ did not expressly discredit each witness who described the same limitations."  Molina, 674 F.3d at 1121. Thus, the ALJ's error was harmless and Plaintiff is not entitled to reversal on this ground.

The ALJ's failure to discuss Woodam's termination letter was also harmless.  The ALJ found that Plaintiff had not engaged in substantially gainful employment since March 30, 2006, the date

---

[7]   The ALJ provided other reasons for discounting Plaintiff's testimony, which Plaintiff claims were erroneous. (J. Stip. 18.)  The reasons listed above were, however, sufficient to support the ALJ's ultimate finding that Plaintiff had diminished credibility; thus, any error in the additional reasons was harmless.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (if substantial evidence supports ALJ's credibility determination and any error "does not negate the validity" of it, error is harmless and does not warrant reversal).

of the letter.  (AR 29.)  Other than stating that Plaintiff's
employment was terminated, Woodam noted only that Plaintiff was
often absent from work due to "personal and family issues."  (AR
189-90.)  Woodam said nothing about Plaintiff's medical or
psychological impairments or their impact on her ability to work.
Thus, even if fully credited, the termination letter provided no
basis for a reasonable ALJ to make a different disability
determination; if anything, it seemed to imply that other,
nonmedical reasons contributed to Plaintiff's poor work
performance.

Finally, the ALJ provided specific and germane reasons for
rejecting the opinion of Wuebel, Plaintiff's therapist.  The ALJ
noted that Plaintiff complained of debilitating psychiatric
symptoms but had only a "recent 2-month period of treatment" by
Wuebel.  (AR 31.)  He noted that Wuebel's opinion conflicted with
Dr. Portnoff's finding, based on "clinical psychological
testing," that Plaintiff suffered from "predominantly mild"
symptoms.  (AR 31-32.)  Wuebel was a therapist (AR 496), whereas
Dr. Portnoff was a board-certified neuropsychologist (AR 361)
whose opinion was therefore entitled to greater weight.  See 20
C.F.R. §§ 404.1513(a) (licensed physicians and psychologists are
considered "acceptable medical sources"), 404.1513(d) (therapists
are considered "other sources"); Gomez v. Chater, 74 F.3d 967,
970-71 (9th Cir. 1996) (ALJ is entitled to "accord opinions from
other sources less weight than opinions from acceptable medical
sources").  The ALJ therefore gave sufficient reasons to reject
Wuebel's statement.  See SSR 06-03p, 2006 WL 2329939, at *4-5

(Aug. 9, 2006) (factors in § 404.1527(d) - now § 404.1527(c)[8] -
also apply to consideration of opinions of "other" medical
sources, such as therapists, including extent of treatment
relationship and consistency with other evidence).

Plaintiff is not entitled to remand on this ground.

**C.   Determination that Mental Impairments Were Not Severe**

At step two of the sequential evaluation process, a
plaintiff has the burden to present evidence of medical signs,
symptoms, and laboratory findings that establish a medically
determinable physical or mental impairment that is severe and can
be expected to result in death or last for a continuous period of
at least 12 months. Ukolov v. Barnhart, 420 F.3d 1002, 1004-05
(9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D));[9]
see 20 C.F.R. §§ 404.1520, 404.1509. Substantial evidence
supports an ALJ's determination that a claimant is not disabled
at step two when "there are no medical signs or laboratory
findings to substantiate the existence of a medically
determinable physical or mental impairment." Ukolov, 420 F.3d at
1004-05 (citing SSR 96-4p). An impairment may never be found on
the basis of the claimant's symptoms alone. Id. at 1005.

Step two is "a de minimis screening device [used] to dispose

_____

[8]   20 C.F.R. § 404.1527(d) was redesignated as § 404.1527(c)
in March 2012. See How We Collect and Consider Evidence of
Disability, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (to be
codified at 20 C.F.R. pts. 404 and 416).

[9]   A "medical sign" is "an anatomical, physiological, or
psychological abnormality that can be shown by medically
acceptable clinical diagnostic techniques." Ukolov, 420 F.3d at
1005.

27

1  of groundless claims." <u>Smolen</u>, 80 F.3d 1290.  Applying the
2  applicable standard of review to the requirements of step two, a
3  court must determine whether an ALJ had substantial evidence to
4  find that the medical evidence clearly established that the
5  claimant did not have a medically severe impairment or
6  combination of impairments.  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687
7  (9th Cir. 2005); <u>see also</u> <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306
8  (9th Cir. 1988) ("Despite the deference usually accorded to the
9  Secretary's application of regulations, numerous appellate courts
10 have imposed a narrow construction upon the severity regulation
11 applied here.").  An impairment or combination of impairments can
12 be found "not severe" only if the evidence established a slight
13 abnormality that had "no more than a minimal effect on an
14 individual's ability to work."  <u>Webb</u>, 433 F.3d at 686 (citation
15 omitted).

16    Substantial evidence supports the ALJ's finding that
17 Plaintiff's mental impairments were not severe.  As the ALJ
18 observed (AR 30-31), Dr. Portnoff conducted several tests and
19 found Plaintiff not significantly limited at the workplace on a
20 psychological basis (AR 361-66).  Dr. Portnoff found that
21 Plaintiff had no restriction in her daily activities; no
22 significant difficulties with concentration, persistence, and
23 pace; no history of emotional deterioration in work-like
24 settings; and no limitations in her ability to respond
25 appropriately to usual or routine work situations, such as
26 attendance and safety.  (AR 365.)  He further found that
27 Plaintiff was able to understand, carry out, and remember simple
28 instructions and had "no significant cognitive defects."  (AR

364-65.)   In fact, Portnoff found only "mild limitations in
maintaining social functioning"; "mild limitations in her ability
to deal with unexpected changes in a routine work setting"; and
"mild-to-moderate limitations in her ability to respond
appropriately to co-workers, supervisors, or the public."  (AR
365.)  After reviewing that evidence, the ALJ concluded that
Plaintiff's "medically determinable mental impairments of
depression and anxiety have not caused more than minimal
limitation in the claimant's ability to perform basic mental work
activities for a 12 consecutive month period and are therefore
nonsevere."  (AR 31.)

     In arguing that the ALJ's evaluation was wrong, Plaintiff
primarily relies on the discredited medical evidence and lay
statements discussed in sections A and C above.  (J. Stip. 24-
26.)  Plaintiff also argues (J. Stip. 24) that Dr. Michael
Vivian's records and opinion, which were submitted to the Appeals
Council after the ALJ issued his decision in this case (AR 1-4),
establish that Plaintiff suffered from a severe mental
impairment.  But Dr. Vivian first saw Plaintiff on July 29, 2009,
just three weeks before the ALJ issued his decision.  (AR 563.)
The treatment notes from that period do not reflect any
functional limitations resulting from Plaintiff's mental
impairments.  (AR 558-64.)  Over a year later, in August 2010,
Dr. Vivian completed a mental impairment questionnaire but did
not indicate that the assessment pertained to Plaintiff's
condition on or before the time the ALJ issued his decision.  (AR
580-83.)  Dr. Vivian's August 2010 report thus was not material
to this appeal.  See 20 C.F.R. § 404.970(b) ("If new and material

evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period <u>on or before</u> the date of the administrative law judge hearing decision." (emphasis added)); <u>cf.</u> <u>Taylor</u>, 659 F.3d at 1233 (Appeals Council should have considered doctor's later opinion of disability because it related to period before disability insurance expired and before ALJ issued decision).

Even if the ALJ erred by finding Plaintiff's mental impairments nonsevere, that error was harmless because he considered her minimal mental limitations when determining her RFC at step four. <u>See</u> <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007) (failure to address particular impairment at step two harmless if ALJ fully evaluates claimant's medical condition in later steps of sequential evaluation process); <u>see also</u> <u>Stout</u>, 454 F.3d at 1055 (ALJ's error harmless when "inconsequential to the ultimate nondisability determination"). Specifically, the ALJ properly accounted for any work-related impairments resulting from Plaintiff's mental impairments by concluding that she could perform medium work "with mild to moderate limitation in responding appropriately to coworkers, supervisors, or the public." (AR 32.)

Plaintiff is not entitled to remand on this ground.

**D.   Determination that Plaintiff Could Perform Past Work**

    **1.   The governing law**

At step four of the five-step process, the claimant has the burden of proving she cannot return to her "former type of work," either as actually performed or as generally performed in the national economy. <u>Pinto v. Massanari</u>, 249 F.3d 840, 845 (9th

1  Cir. 2001) (quoting <u>Villa v. Heckler</u>, 797 F.2d 794, 798 (9th Cir.
2  1986)).  If the claimant meets that burden, the analysis
3  continues to step five.  20 C.F.R. § 404.1520(f)-(g).

4   At step five, the Commissioner has the burden to demonstrate
5  that the claimant can perform some other work that exists in
6  "significant numbers" in the national economy, taking into
7  account the claimant's RFC, age, education, and work experience.
8  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C.
9  § 423(d)(2)(A); 20 C.F.R. § 404.1560(c).  The Commissioner may
10 satisfy that burden either through the testimony of a vocational
11 expert or by reference to the Medical-Vocational Guidelines
12 appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the
13 grids").  <u>Tackett</u>, 180 F.3d at 1100-01.

14  The grids present, in table form, a short-hand method for
15 determining the availability and numbers of suitable jobs for a
16 claimant.  <u>Id.</u> at 1101; <u>Lounsbury v. Barnhart</u>, 468 F.3d 1111,
17 1114 (9th Cir. 2006).  They consist of a matrix of four factors –
18 physical ability, age, education, and work experience – and set
19 forth rules that identify whether jobs requiring specific
20 combinations of those factors exist in significant numbers in the
21 national economy.  <u>Heckler v. Campbell</u>, 461 U.S. 458, 461-62, 103
22 S. Ct. 1952, 1954-55, 76 L. Ed. 2d 66 (1983).  If such work
23 exists, the claimant is not disabled.  <u>Id.</u> at 462; <u>Lounsbury</u>,
24 468 F.3d at 1114.

25  When a claimant suffers only "exertional," or strength-
26 related, limitations, the ALJ must consult the grids.
27 <u>Lounsbury</u>, 468 F.3d at 1115.  When a claimant suffers from both
28 exertional and nonexertional limitations (such as pain or a

mental impairment), the ALJ must first determine whether the grids mandate a finding of disability with respect to exertional limitations.   See Lounsbury, 468 F.3d at 1116; Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir. 1989).   If so, the claimant must be awarded benefits.   Cooper, 880 F.2d at 1155.   If not, the ALJ may be required to take the testimony of a vocational expert.   Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007).   But vocational expert testimony is required only if the nonexertional limitation is "'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations."   Id. (quoting Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).   "The severity of the limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two."   Id.   Thus, the mere fact that a nonexertional limitation exists is insufficient to require testimony from a vocational expert even if the impairment underlying the limitation is found to be severe at step two. Id.; see also Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 577 (9th Cir. 1988) ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids.").

**2.   Analysis**

After considering the entire record, the ALJ concluded that Plaintiff had the RFC to perform "medium work" with mild to moderate limitation in responding appropriately to coworkers, supervisors, and the public.   (AR 32.)   The ALJ also found that Plaintiff had "past relevant work as a front desk receptionist,

secretary, and dental claims associate," which are "generally
considered sedentary to light." (AR 33.) The ALJ therefore
concluded that Plaintiff was able to perform that past relevant
work because she was capable of performing the more difficult
"medium work." (Id.) The ALJ also went on to make a step-five
determination of nondisability, finding that Plaintiff's
"additional limitations" had "little or no effect on the
occupational base of unskilled medium work" and that Plaintiff
was therefore "not disabled" under Medical-Vocational Rule
203.29. (AR 33-34.)

Plaintiff argues that the ALJ "overlook[ed]" the mental
requirements and temperaments required for each of her former
jobs, and thus his step-four conclusion was in error. (J. Stip.
at 30.) Specifically, Plaintiff argues that according to the
Dictionary of Occupational Titles, the jobs of receptionist,
secretary, and dental-claims associate require "significant
people skills." (J. Stip. 30 (internal quotation marks
omitted).) Thus, Plaintiff argues, even accepting the ALJ's RFC
finding, her "social limitations would preclude performance" of
each of her former jobs. (AR 30.)

Although the ALJ found at step five that Plaintiff's
"additional limitations" had "little to no effect" on the
occupational base of unskilled medium work (AR 34), he did not
assess whether those limitations would affect her ability to
perform her previous employment, nor did he clarify whether that
work was unskilled, semiskilled, or skilled (AR 33-34). See 20
C.F.R. § 404.1568(a) (unskilled work "needs little or no judgment
to do simple duties that can be learned on the job" in about 30

33

days); id. § 404.1568(b) (semiskilled work "needs some skills but does not require doing the more complex work duties"); id. § 404.1568(c) (skilled work "may require dealing with people, facts, or figures or abstract ideas at a high level of complexity"). The ALJ therefore arguably erred by failing to make specific findings of fact as to the physical and mental demands of each of the former jobs he found Plaintiff capable of performing. See Pinto, 249 F.3d at 844 (although burden of proof lies with claimant at step four, ALJ "still has a duty to make the requisite factual findings to support his conclusion"); cf. Carmickle, 533 F.3d at 1167 ("Broad generic occupational classifications are insufficient to test whether a claimant can perform past relevant work." (quoting Vertigan v. Halter, 260 F.3d 1044, 1051 (9th Cir. 2001) (internal quotation marks, brackets, and ellipses omitted))).

But any error in the ALJ's step-four determination was harmless in light of his alternative finding of nondisability at step five. See Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008) ("Although the ALJ's step four determination constitutes error, it is harmless error in light of the ALJ's alternative finding at step five."); see also Cadena v. Astrue, 365 F. App'x 777, 780 (9th Cir. 2010) ("[T]he ALJ's alternative ruling at step five - that [claimant] could perform light, unskilled work that existed in significant numbers in the national economy - renders the step four error harmless.").

At step five, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. (AR 33-34.)  Although Plaintiff had a "mild to moderate

limitation in responding appropriately to coworkers, supervisors, or the public" (AR 32), the ALJ found that those "additional limitations" had "little to no effect on the occupational base of unskilled medium work" (AR 34).  The ALJ therefore concluded that Plaintiff met the criteria of Medical-Vocational Rule 203.29 (AR 34), which states that a "younger individual" who has at least a high school education that does not provide direct entry into skilled work, has experience performing skilled or semiskilled work, has no transferable skills, and has the ability to perform medium work is not disabled.  20 C.F.R. Part 404, Subpart P, App. 2, § 203.29.  Indeed, the grids specifically state that "the functional capacity to perform medium work represents such substantial work capability <u>even at the unskilled level</u> that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work."  <u>Id.</u> § 203.00(b) (emphasis added).

     The ALJ, moreover, was entitled to rely on the grids at step five without introducing vocational expert testimony because Plaintiff did not have a sufficiently severe nonexertional limitation.  <u>See Hoopai</u>, 499 F.3d at 1077 (holding that claimant's mild to moderate depression "was not a sufficiently severe nonexertional limitation that prohibited the ALJ's reliance on the grids without the assistance of a vocational expert").  The ALJ specifically found that Plaintiff's additional limitations had "little to no effect on the occupational base of unskilled medium work" (AR 34), and that finding was supported by substantial evidence.  As discussed in Section C, Dr. Portnoff's opinion established that Plaintiff had "no significant cognitive

defects" and her mental impairments resulted in no restrictions
in daily activities; no difficulties with concentration,
persistence, or pace; no limitations in her ability to
understand, carry out, and remember simple instructions; and no
limitations in her ability to respond appropriately to usual or
routine work situations.  (AR 364-65.)  Dr. Portnoff found only
"mild-to-moderate" limitations in Plaintiff's ability to respond
appropriately to co-workers, supervisors, and the public; "mild"
limitations in social functioning; and "mild" limitations in her
ability to deal with unexpected changes in a routine work
setting.  (AR 365.)  Thus, substantial evidence supports the
ALJ's finding that Plaintiff's mental impairments did not result
in significant nonexertional limitations.  Indeed, the ALJ's
finding at step two that Plaintiff's mental impairment was not a
"severe" disability further shows that vocational expert
testimony was not required.  Cf. Hoopai, 499 F.3d at 1076
("Clearly, the severity of the limitations at step five that
would require use of a vocational expert must be greater than the
severity of impairments determined at step two, otherwise the two
steps would collapse and a vocational expert would be required in
every case in which a step-two determination of severity is
made.").

         Plaintiff is not entitled to remand on this ground.

1    **VI.    CONCLUSION**

2            Consistent with the foregoing, and pursuant to sentence four

3    of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered

4    AFFIRMING the decision of the Commissioner and dismissing this

5    action with prejudice.   IT IS FURTHER ORDERED that the Clerk

6    serve copies of this Order and the Judgment on counsel for both

7    parties.

8

9

10   DATED: May 15, 2012          _____
                                   JEAN P. ROSENBLUTH
11                                 U.S. Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

26      [10]   This sentence provides: "The [district] court shall have
     power to enter, upon the pleadings and transcript of the record,
27   a judgment affirming, modifying, or reversing the decision of the
     Commissioner of Social Security, with or without remanding the
28   cause for a rehearing."

                                    37